UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Vantice Lee Beshears,
        Plaintiff,

vs.                                                                                                                09-2017

C/O Winters, et al.,
        Defendants.

MEMORANDUM OPINION AND ORDER

      Before the court are Defendant, Winter's summary judgment motion [29], Plaintiff's response [31] and Defendants' reply [32]. Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and CDIL-LR 7.1(D)

Standard

      Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

      "Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc.*, 176 F.3d 390, 390

(7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659. It is also well settled that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Keri v. Barod of Trustees of Purdue University*, 458 F.3d 620, 628 (7th Cir.2006)(*citing Haywood v. N. Am. Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997).

Background

On January 21, 2009, Plaintiff, Vantice L. Beshears filed his complaint against Stephen Winters (hereinafter referred to as "Winters"), one unknown C/O, the Champaign County Sheriff's Office and Champaign County. On August 19, 2009, the Court held a Merit Review Hearing to evaluate the sufficiency of Beshears' Complaint. On August 19, 2009, this Court entered an Order wherein Beshears was allowed to pursue a Section 1983 claim against Stephen Winters for an alleged use of excessive force and against one unknown C/O for alleged failure to protect and intervene. The other named Defendants were terminated from the case. No unknown remaining party defendants were identified. Beshears' brought his Complaint, under 42 U.S.C. § 1983. Beshears, a federal prisoner, was on a writ transfer from the Bureau of Prisons, Terre Haute, Indiana to the Champaign County in Illinois for a criminal proceedings in the Champaign County Court where he had previously been convicted on a charge of theft. He alleges that on February 19, 2008, while a detainee at the Champaign County Correctional Center, he was placed in an unlawful hold by Winters and that an unknown C/O failed to intervene. Beshears alleges that Winters' actions were excessive use of force and that the unknown C/O's inaction was a failure to intervene and protect his constitutional rights under the 8th Amendment. Plaintiff filed his lawsuit pursuant to U.S.C. Section 1983. At the time of the alleged incident, the plaintiff was a federal prisoner held in a county jail. It is not unusual for federal prisoners awaiting trial or sentencing or some other court proceeding to be held in county jail facilities. Ordinarily, a county employee caring for federal prisoners arguably becomes a federal actor, rather than the requisite state actor, rendering § 1983 inapplicable. See 42 U.S.C. § 1983; *cf. Wilkinson v. Dotson*, 544 U.S. 74, 87 (2005). However, in this case, the court reasonably assumes a writ was issued for the plaintiff's appearance by the state court judge in the criminal proceedings. Therefore, the court also reasonably assumes the plaintiff was not held in jail under a contract between the federal government and the Champaign jail for his imprisonment, subsistence and care of Beshears, but rather the tab for his stay was picked up by the County of Champaign. Therefore, the defendants would be state actors and it would be proper for the plaintiff to proceed pursuant to § 1983.

Undisputed Material Facts[1]

1. Stephen Winters is a corrections officer employed by the Champaign County Sheriff's Department. (Winters Aff., ¶ 3, attached as Exhibit 1).
2. Stephen Winters is a Certified Field Training Officer in Control Tactics and Tasers and routinely taught courses to other law enforcement and corrections officers as adjunct faculty at the University of Illinois Police Training Institute from 2004 through 2010. (Winters Aff., ¶ 4)
3. Jeremy Heath received his B.S. Degree from western Illinois University in 2001. Heath began working as a Correctional Officer with the Corrections Division of the Champaign County Sheriff's Department in 2001, worked there until September, 2008 and since that time has been employed by the Rantoul Police Department in the Patrol Division. (Heath Aff., ¶ 3)
4. Ryan Snyder began working for the Champaign County Sheriff's Department as a Master Control Operator in the Champaign County Correctional Center in June, 2006, held that position from June, 2006 until September, 2008 and has served as a Correctional Officer with the Corrections Division of the Champaign County Sheriff's Department since that time. (Snyder Aff., ¶ 3)
5. On or about February 19, 2008, Winters and Heath were employed in their capacity as corrections officers at the Champaign County Sheriff's Department and working in the Champaign County Correctional Center. (Winters Aff., ¶ 5) (Heath Aff., ¶ 4) (Snyder Aff., ¶ 4)
6. On or about February 19, 2008, Snyder was employed in his capacity as a master control operator and working in the Champaign County Correctional Center. (Snyder Aff., ¶ 4)
7. On that date and at the relevant time, Heath had responsibility to move four or five inmates by himself from the "dress-in" area to the actual housing ward pod of the Champaign County Correctional Center. (Heath Aff., ¶ 5) (Winters Aff., ¶ 6) (Snyder Aff., ¶ 7)
8. Among this group of inmates was Vantice Beshears. (Heath Aff., ¶ 5)
9. As Heath began to move this group of inmates from the "dress-in" area to housing, inmate Beshears informed him that he wanted his legal papers. (Heath Aff., ¶ 6)

---

[1] The exhibits can be found attached to Defendants' Summary Judgment Motion [29]. Further, Plaintiff's Response [31] is a response and a several "Counter Affidavits." He has filed Counter Affidavit to Defendants' Motion for Summary Judgment, a Counter Affidavits to the Affidavits of Defendants Winters, Heath, Snyder and Cook. None of the Plaintiff's Counter Affidavits are actually affidavits or declarations under Federal Rules. These affidavits do not properly dispute any of the facts asserted in Defendants' Motion for Summary Judgment. Rather, Plaintiff offers a general denial of the facts, law, and argument set forth in the Defendants' Motion for Summary Judgment and Memorandum of Law in Support thereof, without any competent factual support, nor any case authority contrary to that set out in Defendants' Motion. As Plaintiff's Affidavits do not comply with the federal rules, they are not considered.

10. Heath asked Beshears to describe the legal papers he wanted and that Heath would retrieve and deliver them to Beshears once he was done moving the group into housing unit pod. (Heath Aff., ¶ 6)
11. At that point, inmate Beshears stopped walking towards the housing unit and indicated that was unacceptable to him and he wanted his papers before they went any further. (Heath Aff., ¶ 6)
12. Again, Heath reassured inmate Beshears that he would secure and deliver the desired paperwork to him once everyone was safely in the housing unit. (Heath Aff., ¶ 7)
13. Heath then asked him to move with the others towards the housing unit pod. Inmate Beshears refused to move any further without his paperwork. (Heath Aff., ¶ 7)
14. Heath ordered the other three or four inmates to stop while he attempted to get inmate Beshears to comply. (Heath Aff., ¶ 7)
15. Heath ordered him to move towards the housing unit but Beshears continued to refuse to move without his papers. (Heath Aff., ¶ 7)
16. At this point, Heath was concerned about inmate Beshears lack of compliance and Heath's ability to control Beshears and the other group of inmates separately. (Heath Aff., ¶ 7)
17. At this time, Winters became conscious that inmate Beshears was not complying with the request of Heath to move into the appropriate area of the jail. (Winters Aff., ¶ 6) (Heath Aff., ¶ 8)
18. Winters directed his attention to the area of the disturbance and then approached. (Winters Aff., ¶ 7) (Heath Aff., ¶ 9)
19. As Winters approached, he asked Beshears to comply with Officer Heath's request. (Winters Aff., ¶ 7) (Heath Aff., ¶ 9)
20. Inmate Beshears informed Winters that he would not be going anywhere until he received his legal papers. (Winters Aff., ¶ 7) (Heath Aff., ¶ 10)
21. Winters again asked Beshears to comply and he refused. (Winters Aff., ¶ 7) (Heath Aff., ¶ 10)
22. At the time, Officer Heath redirected his attention to the other three or four inmates and Winters took responsibility for inmate Beshears. (Winters Aff., ¶ 7) (Heath Aff., ¶ 11)
23. After a few steps with inmate Beshears, Winters met Beshears' passive resistance by placing his hand on Beshears' shoulder to usher him towards the appropriate area of the jail. (Winters Aff., ¶ 8) (Heath Aff., ¶ 12)
24. At that moment, inmate Beshears resisted Winters' attempt to usher him by pushing back against his hand gesture and simultaneously spun around and squared-off shoulder to shoulder and face-to-face with him. (Winters Aff., ¶ 8) (Heath Aff., ¶ 12)
25. As Beshears became an active resister, Winters immediately placed inmate Beshears in an arm-bar hold and took him to the ground, leaned his body weight against him until Heath came to assist in securing Beshears in hand-cuffs and then secured him in handcuffs. (Winters Aff., ¶ 9) (Heath Aff., ¶ 13) (Snyder Aff., ¶ 10)
26. From the moment Winters applied the arm-bar hold, inmate Beshears actively physically resisted him by trying to punch, hit, kick and wrestle away from him. (Winters Aff., ¶ 10) (Heath Aff., ¶ 14) (Snyder Aff., ¶ 9)

27. Once inmate Beshears was placed in hand-cuffs and under control, he was lifted off the ground and taken to the segregation unit without additional incident. (Winters Aff., ¶ 11) (Heath Aff., ¶ 15) (Snyder Aff., ¶ 12)
28. Inmate Beshears did not seek any medical care or other type of treatment following the subject incident while at the Champaign County Correctional Center during that particular period of incarceration. (Winters Aff., ¶ 13) (Heath Aff., ¶ 12)
29. Nathaniel "Shane" Cook is a Sergeant with the law enforcement division of the Champaign County Sheriff's Department. (Cook Aff., ¶ 3)
30. Sgt. Cook has been in law enforcement for over a decade. (Cook Aff., ¶ 8) (Cook Report)
31. After four years service to the United States Army in the 3rd Infantry Division in Vilseck, Germany, Cook attended the University of Illinois Police Training Institute in 1999 and graduated that same year and from 1999-2000 Cook served as a police officer with Parkland College. (Cook Aff., ¶ 8) (Cook Report)
32. From 2000-2004, Cook served with the Rantoul Police Department. (Cook Aff., ¶ 8) (Cook Report)
33. From 2004-present Cook has served as a member of the Champaign County Sheriff's Office and also has served as a member of the Metro S.W.A.T. team. (Cook Aff., ¶ 8) (Cook Report)
34. In addition to the foregoing, Cook has attended multiple courses/seminars relating to the use of force in law enforcement and corrections settings. (Cook Aff., ¶ 8) (Cook Report)
35. By 2004, Cook received his Taser Instructor certification from the University of Illinois Police Training Institute and in 2006, he received his Master Control Tactics and Master Firearms Instructor certifications from the University of Illinois Police Training Institute. (Cook Aff., ¶ 8) (Cook Report)
36. Cook continues to train control tactics and firearms to the Champaign County Sheriff's Office. (Cook Aff., ¶ 8) (Cook Report)
37. Cook has served as a field training officer for the Rantoul Police Department, the Metro S.W.A.T. team, has served as the same for the Champaign County Sheriff's Office and is also responsible for training members of the Champaign County Sheriff's Office (including both correctional officers and deputies) in the use of force in control tactics and firearms. (Cook Aff., ¶ 8) (Cook Report)
38. Cook interviewed Stephen Winters, Jeremy Heath and Ryan Snyder regarding the subject incident and subsequently reviewed each of their affidavits. (Cook Aff., ¶ 5)
39. The information that they each provided Cook was consistent with the information provided by the others and as is set forth in their affidavits. (Cook Aff., ¶ 5)
40. Cook also reviewed the sworn deposition testimony of Beshears regarding the subject incident. (Cook Aff., ¶ 6)
41. The use of force employed by Stephen Winters during the exchange with Beshears on or about February 19, 2008 in the Champaign County Correctional Center was reasonable, legitimate and justified under the applicable standards for the use of force in corrections and law enforcement. (Cook Aff., ¶ 8) (Shane Report)
42. When Beshears refused to go to the segregation pod of the Champaign County Correctional Center without his legal paperwork after he was verbally instructed to do so by an unknown

43.     correctional officer and Stephen Winters, he became non-compliant and in doing so, he became a passive resister. (Cook Aff., ¶ 8) (Cook Report)
43. Winters' subsequent use of his hand to usher Beshears to the segregation pod was reasonable and appropriate given the circumstances. (Cook Aff., ¶ 8) (Cook Report)
44. When Beshears opposed the hand-ushering by Stephen Winters, turned towards Winters and "squared-off" face-to-face with Winters, Beshears became an active resister and then an aggressive assailant almost simultaneously such that there was little to no time interval between the two stages of behavior by Beshears. (Cook Aff., ¶ 8) (Cook Report)
45. Once Beshears became an active resister, Winters was reasonable and justified to employ the following uses of force: wristlocks, armlocks, stunning techniques, take-downs, chemical agents and/or canine deployment. (Cook Aff., ¶ 8) (Cook Report)
46. Once Beshears elevated his non-compliance to the aggressive assailant status, Winters was reasonable and justified to employ the following uses of force: any of the foregoing uses of force and punches, kicks and other strikes/blocking techniques. (Cook Aff., ¶ 8) (Cook Report)
47. Stephen Winters' use of the arm-bar hold and take down technique in order to gain physical control of Vantice Beshears was a reasonable, legitimate and justified use of force. (Cook Aff., ¶ 8) (Cook Report)
48. It was also legitimate for Winters to use his body weight to control Beshears until another correctional officer could assist in hand-cuffing Beshears. (Cook Aff., ¶ 8) (Cook Report)
49. When Beshears began to punch and kick Winters during the subject event, Beshears was acting as an aggressive assailant. (Cook Aff., ¶ 8) (Cook Report)
50. There is no legitimate basis to suggest that any other Champaign County Correctional Officer(s) had any duty to intervene on behalf of Beshears at any time, including during the use of force by Stephen Winters, as said uses of force were reasonable, legitimate and justified. (Cook Aff., ¶ 8) (Cook Report)

Discussion and Conclusion

First, the court notes that 18 U.S.C. § 4002 empowers the Attorney General to contract with states or their political subdivisions "for the imprisonment, subsistence, care, and proper employment" of federal prisoners. A defense not presented by the defendants is the applicability of § 1983 to employees of a local correctional facility that is housing federal inmates under contract between the federal and local governments. See 18 U.S.C. § 4002. A county employee caring for federal prisoners arguably becomes a federal actor, rather than the requisite state actor, rendering § 1983 inapplicable. See 42 U.S.C. § 1983; *cf. Wilkinson v. Dotson*, 544 U.S. 74, 87 (2005) (Scalia, J., concurring) (noting, in a different context, that federal prisoners whose custodians are not acting under color of state law cannot sue pursuant to § 1983); *Sandoval v. Wackenhut Corr. Corp.*, No. 93-8582, 1994 WL 171703, at *2 n.3 (5th Cir. Apr. 28, 1994) (recognizing that employees of a privately run correctional facility operated under contract with the federal government were not state actors for purposes of § 1983). The court doubts, however, that the contractual relationship does anything to change the status of county jail employees as state actors. *Cf. Logue v. United States*, 412 U.S. 521, 528-32 (1973) (declining, for purposes of federal government liability under the Federal

6

Tort Claims Act, to characterize as federal employees county jailers who were caring for federal prisoners). However, as already discussed, the court reasonably assumes the plaintiff was not held in jail under a contract between the federal government and the Champaign jail for his imprisonment, subsistence and care of Beshears, but rather the tab for his stay was picked up by the County of Champaign. Therefore, the defendants would be state actors and it would be proper for the plaintiff to proceed pursuant to § 1983.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain." *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Excessive force is force applied "maliciously and sadistically to cause harm," as opposed to force applied "in a good-faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 5. Therefore, when prison officials use physical force against an inmate "to restore order in the face of a prison disturbance, ... the question whether the measure taken inflicted unnecessary and wanton pain ... ultimately turns on 'whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *See Whitley v. Albers*, 475 475 U.S., at 106 at 319, 106 S.Ct., at 1084, *quoting Ingraham v. Wright*, 430 U.S., at 670, 97 S.Ct., at 1412, in turn *quoting Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Relevant factors include the need for force, the relationship between that need and the force applied, the threat reasonably perceived by the officers, the efforts made to temper the severity of the force employed, and the extent of the prisoner's injury. *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000), *citing Hudson*, 503 U.S. at 7. "[W]hile significant injury is not required, a claim ordinarily cannot be predicated upon a de minimis use of force." DeWalt, 224 F.3d at 619; *see also* Outlaw *v. Newkirk*, 259 F.3d 833, 839 (7th Cir. 2001)(minor injury from guard shutting cuffport door on inmate's hand dismissed on summary judgment for guard). Significant injury is not required to state a claim, but its absence tends to support that only de minimis force was used. *Outlaw v. Newkirk*, 259 F.3d at 839 (7th Cir. 2001).

Was the actual use of force de minimis in nature? Again, the "unnecessary and wanton infliction of pain" on a prisoner violates his rights under the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quotations omitted); see also Hudson v. McMillian, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). However, not every "malevolent touch" by a security officer implicates the Constitution. *Hudson*, 503 U.S. at 9, 112 S.Ct. 995. The use of de minimis force, so long as it "is not of a sort repugnant to the conscience of mankind," is not of Eighth Amendment concern. *Id*. at 9-10, 112 S.Ct. 995 (quotations omitted). If the force is more than de minimis, the court must consider whether it "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id*. at 7, 112 S.Ct. 995. In the case at bar, the force used was an arm-bar control technique and take-down maneuver. There were no punches thrown by any corrections officer at the Plaintiff. The Plaintiff was taken from a point of active aggressiveness to no resistance in a matter of moments. The court finds this use of force is inherently de minimis in nature. Once Beshears was secured in hand-cuffs, the force applied was removed. Therefore, the court need not continue on with its analysis and must grant summary judgment on behalf of Winters and the Unknown C/O Officer.

Nevertheless, the court will look to the second part of the analysis – what was the state of mind of Winters at the time of the use of the force with Beshears? As stated above, only the "unnecessary and wanton infliction of pain" violates a prisoner's rights under the Eighth Amendment. *Whitley*, 475 U.S. at 319, 106 S.Ct. 1078 (quotations omitted). The Constitution is not offended when force is used "in a good-faith effort to maintain or restore discipline." Hudson, 503 U.S. at 7, 112 S.Ct. 995. Non-de minimis force runs afoul of the Eighth or Fourteenth Amendments only when it is intended "maliciously and sadistically to cause harm." *Id*. Jails are dangerous places, and it is without rational dispute that security officials are justified in maintaining decorum and discipline among inmates to minimize risks to themselves and other prisoners. The United States Supreme court has said "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees. If prison officials are to be free to take appropriate action to ensure the safety of inmates and correctional personnel, they must be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline to maintain institutional security. Such considerations are peculiarly within the province and professional expertise of correctional officers, and without substantial evidence to indicate such officials have exaggerated their response to these considerations, courts should defer to their judgment. Not only are such administrators in a better position to know and determine what action or remedies are needed and proper, but the operation of our correctional systems and facilities is within the responsibility of the Executive and Legislative branches of government." *Bell v. Wolfish,* 441 U.S. at 547-548, 99 S.Ct. at 1878-1879; *Procunier v. Martinez,* 416 U.S. at 405, 94 S.Ct. at 1807. *See also, Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Hewitt v. Helms, infra.* The Supreme Court has "repeatedly said both that prison officials have broad administrative and discretionary authority over the institution they manage, and that lawfully incarcerated persons retain only a narrow range of protected liberty interests." *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). The Seventh Circuit has previously discussed how important it is that prisoners follow orders:

> "Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them.... Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger."

Lewis v. Downey, 581 F3d 467, 476 (7th Cir. 2009).

Several factors are relevant in determining whether a defendant applied force in good faith or for purposes of causing harm, including the need for force, the amount of force used, the threat reasonably perceived by the officer, efforts made to temper the severity of the force, and the extent of the injury caused by the force. *Fillmore*, 358 F.3d at 504; *see also Whitley*, 475 U.S. at 321, 106 S.Ct. 1078. In the instant case, the facts before this court establish that at the time of the use of force, the Plaintiff was refusing to go to the housing unit unless he received his legal paperwork

beforehand. At the time Plaintiff Beshears was not complying, he was in a group with four other inmates and in route to the housing unit of the jail. Officer Heath and Winters were concerned that Beshears' refusal to comply would arouse the other then-compliant prisoners. Winters assisted Heath so that Heath could focus his attention on the four complying prisoners while Winters focused on Beshears. The court finds that Winters use of force was justified to maintain order. At first, Winters simply tried to hand-usher the non-compliant Beshears, but that was met with additional resistance. Once Beshears squared-off on Winters, he became actively aggressive. Therefore, Winters reasonably perceived a threat and he acted quickly to disarm it. The use of arm-bar and take-down maneuvers were simply not excessive. No chemicals, no tasers or other deadly uses of force were even threatened, much less utilized. No physical blows were attempted or landed on the Plaintiff. Thus, the amount of force was tempered and directly related to the acts of the Plaintiff. The amount of force ultimately used was minimal and efficiently employed in a good faith effort to maintain discipline and jail security and not to maliciously or sadistically cause harm to Plaintiff. In fact, once Beshears was hand-cuffed, he was taken off the ground, put on his feet and taken to the segregation unit of housing without further incident. Therefore, the use of force restored the order Winters sought. There are no facts in the record that suggest Winters exercised any force with the intent to cause "malicious and sadistic" harm. Further, there is no evidence in the case that the Plaintiff was injured during the event. Therefore, on this basis also, the Plaintiff cannot establish a Constitutional excessive force claim or failure to protect and intervene claim.

Although his lawsuit is dismissed, the plaintiff is still obligated to pay the filing fee in full. The plaintiff has made one payment of $4.26 in this lawsuit. His balance is $345.74. The court notes that when the plaintiff filed his lawsuit, he was incarcerated at a federal prison, but since then he has been released from federal prison and is now in state prison, the Graham Correctional Center.
It is therefore ordered:

1. Pursuant to Fed. R. Civ. P. 56 and CDIL-LR 7.1(D), the defendant's motion for summary judgment is granted [29]. The clerk of the court is directed to enter judgment in favor of both defendants and against the plaintiff. All pending matters are denied as moot, and this case is terminated.
2. If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. See Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).
3. Although his lawsuit is dismissed, the plaintiff is still obligated to pay the filing fee in full. The agency having custody of Plaintiff shall make monthly payments of 20 percent of the preceding month's income credited to Plaintiff's account to the Clerk of Court. The agency having custody of the plaintiff shall forward these payments each time Plaintiff's account exceeds $10, until the filing fee of $350 is paid in full. The Clerk is directed to mail a copy of this order to Plaintiff's place of confinement, to the attention of the Trust Fund Office,

Graham Correctional Center, the plaintiff's current place of incarceration. The plaintiff has made one payment of $4.26 in this lawsuit. His balance is $345.74. Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee.

Enter this 18th day of January 2011.

/s/ Michael P. McCuskey
_____
Michael P. McCuskey
Chief United States District Judge